UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| LARRY DAVIS, individually and ALAN NORTHROP, individually, | CASE NO. 12-5765 RJB |
| Plaintiffs, | ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| CLARK COUNTY, WASHINGTON, a municipal corporation, and DONALD SLAGLE, | |
| Defendants. | |

This matter comes before the Court on Defendants' Motion for Summary Judgment.  Dkt. 25.  The Court has considered the pleadings filed regarding the motion, argument of counsel heard on August 1, 2013, and the remaining file.

This case arises from a series of tragedies.  It was filed by two men who were convicted in 1993 of brutally raping a woman and spent 17 years in prison as a result.  In 2010, deoxyribonucleic acid ("DNA") testing resulted in their exoneration.  In this civil suit, they seek damages against Detective Donald Slagle, who was the head investigator of the crime, and against Clark County, Washington, Det. Slagle's employer, asserting that Det. Slagle and Clark County violated their constitutional due process rights and committed various state torts against them.  Dkt. 1.  In the pending motion, Det. Slagle and Clark County seek summary dismissal of

the claims against them.  For the reasons set forth below, the motion should be granted, in part, and denied, in part.  Due to the complexity of this case, a table of contents is provided.

<b>TABLE OF CONTENTS</b>

I. **FACTS AND PROCEDURAL HISTORY**

    A. **BACKGROUND FACTS**

        1. Rape of Kari Morrison

        2. Investigation

            a. *Reports Received that Dark Haired Assailant looks like Mr. Northrop*

            b. *Photo Montage of Mr. Northrop and Ms. Morrison's Non-Identification of Mr. Northrop*

            c. *Interview of Steve Shade*

            d. *Ms. Morrison Identifies Mr. Davis in Photo Montage*

            e. *Interview of Mr. Northrop and Arrest on other Charges*

            f. *Interview and Arrest of Mr. Davis*

            g. *Ms. Morrison Hears of Suspects*

            h. *Mr. Davis's Lineup*

            i. *Detectives Talk with Ms. Morrison before Mr. Northrop's Lineup; Mr. Northrop's Lineup & Arrest*

            j. *Reports from Neighbors of the Home Where Attack Occurred*

            k. *Discussion of Cases among Clark County Detectives*

        3. Mr. Davis's Trial

        4. Mr. Northrop's Trial

        5. Post Conviction Appeals

1       6. Post Conviction DNA Testing

2       7. Proceedings before Clark County Superior Court in 2010

3       8. Archived Box Produced to Plaintiffs in 2013 and other Recent Discovery

4    B. **PROCEDURAL HISTORY**

5    C. **PENDING MOTION**

6    D. **ORGANIZATION OF OPINION**

7 II. **DISCUSSION**

8    A. **SUMMARY JUDGMENT STANDARD**

9    B. **FEDERAL CLAIMS**

10      1. Collateral Estoppel

11        a. *Collateral Estoppel Regarding Due Process Claims based on Overly*

12        *Suggestive identification Procedures*

13          i. Whether Mr. Davis is collaterally estopped from making his

14          current claim that the identification procedures (the photo montage

15          and live line up) violated his due process rights?

16          ii. Whether Mr. Northrop is collaterally estopped from making his

17          current claim that the identification procedures (the photo montage

18          and live line up) violated his due process rights?

19        b. *Collateral Estoppel Regarding Due Process Claims Based on Brady v.*

20        *Maryland, 373 U.S. 83 (1963)*

21          i. Whether Mr. Northrop is collaterally estopped from making his

22          current claim that the failure to disclose Ms. Morrison's non-

23

24

identification of him in the photo montage three days after the rape

violated his *Brady* based due process rights?

ii. Whether Mr. Davis is collaterally estopped from making his

current claim that the failure to disclose Ms. Morrison's non-

identification of Mr. Northrop in the photo montage three days

after the rape violated his *Brady* based due process rights?

iii. Whether Mr. Northrop and Mr. Davis are collaterally estopped

from making their *Brady* claim regarding the non-disclosure of Ms.

Morrison being under investigation for embezzlement at the time?

2. Due Process Claims Based on Brady Violations and Qualified Immunity

a. *Failure to Turn Over Information About the Investigation of Ms.*

*Morrison - Violation of Dr. Davis and Mr. Northrop's Due Process*

*Rights?*

b. *Failure to Disclose the Exact Date of Ms. Morrison's Non-*

*Identification of Mr. Northrop – Violation of Mr. Davis's Clearly*

*Established Due Process Rights?*

c. *Failure to Disclose Information on Other Suspects  - Violation of Mr.*

*Davis and Mr. Northrop's Clearly Established Due Process Rights?*

3. Due Process Claims Against Clark County Under § 1983

**C. STATE LAW CLAIMS**

1. Statute of Limitations

2. Negligent Investigation Against Det. Slagle and Clark County

3. Negligent Training, Supervision, and Retention Claim Against Clark County

1        *a. Clark County Liability based on Vicarious Liability for Det. Slagle's*

2        *Investigation*

3        *b. Clark County Liability Based on Independent Duty to Train and*

4        *Supervise – for Actions Outside the Scope of Employment*

5    **D. CONCLUSION**

6    III**. ORDER**

7    The body of the Order now follows.

8                        **I.        FACTS AND PROCEDURAL HISTORY**

9    **A.  BACKGROUND FACTS**

10       The Court is mindful that at oral argument, Plaintiffs' motions to strike certain of

11   Defendants' exhibits and attachments were granted.  As a result, the following facts are gleaned

12   from the remaining record which was provided by the non-moving party (including police

13   reports, some of the testimony heard during the criminal trials, and deposition testimony taken

14   for purposes of this litigation) and may or may not reflect all the facts and evidence that may be

15   admitted at trial.

16       1.   Rape of Kari Morrison

17       The following facts are taken from a March 17, 1993 interview of Kari Morrison by Deputy

18   Prosecutor Robert Shannon, investigator Steven Teply, and victim advocate Janet Ragan.  Dkt.

19   41-20.

20       On January 11, 1993, Kari Morrison was cleaning a home in La Center, Washington.  Dkt.

21   41-20, at 3.  She left the front door of the residence open so that she could retrieve cleaning

22   supplies from her truck.  *Id.*  She began work around 9:30 a.m.  Dkt. 41-20, at 3.  After ten or

23   fifteen minutes, two men broke into the home and attacked her.  Dkt. 41-20, at 9.  One man was

24

1    blonde and large and the other was smaller with dark hair.  *Id.*  They had gloves on. Dkt. 41-20,

2    at 9.  A violent struggled ensued.  *Id.*  Ms. Morrison states that she got a better look at the dark

3    haired attacker because the blonde attacker primarily stayed behind her and held her.  *Id.*, at 11.

4    Eventually, the men dragged her to the kitchen, placed duct tape over her eyes, and tied both

5    arms and one leg to the kitchen table.  *Id.,* at 13-15.  The dark haired attacker cut a hole in her

6    pants and raped her with a foreign object.  *Id.,* at 16-18.  Ms. Morrison then heard tearing of

7    something that sounded like a condom package.  *Id*., at 19.  She stated that the blonde assailant

8    said something like "you don't have time for that," and the other replied "well, I'm not doing her

9    without it."  *Id.*  Ms. Morrison stated that the dark haired assailant then raped her while the

10   blonde one held her down.  *Id.*  She stated that then she heard a horn honking and the blonde

11   attacker said something like "come on we got to go, you know that's our signal."  *Id.,* at 20.  Ms.

12   Morrison struggled to the phone and called  9-1-1.  *Id.*  Ms. Morrison was rushed to the

13   emergency room.  *Id.*  A medical examination was done.  *Id.*  This concludes the facts taken from

14   the March 17, 1993 interview.

15       DNA testing from samples collected at the hospital were consistent with Ms. Morrison and

16   her then boyfriend.  Dkt. 41-13, at 4.

17       2.  Investigation

18       According to his January 19, 1993 police report, Det. Slagle was dispatched to the scene

19   around 10:30 a.m.  Dkt. 41-21.  He then went to the hospital and talked with Ms. Morrison right

20   after she received medical treatment.  Dkt. 41-21, at 3.  At the hospital, she gave Det. Slagle the

21   following descriptions of the men who had attacked her:  "#1 [w]hite, male, early to mid 20's,

22   5'10" tall, 170 pounds, dk.  bro. hair, dark eyes, medium complexion, ear length hair and long

23   around the face" and "#2 [w]hite, male, early to mid 20's, 6'1" tall, 210 pounds, shoulder-length,

24

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 6

1   dirty blonde hair, very fair complexion with 'pink' spots on the face, muscular." Dkt. 41-21, at

2   4.  Det. Slagle reported that he contacted the homeowner and that nothing was missing from the

3   residence. Dkt. 41-21, at 6.

4         The next day, Clark County Officer Jana Anderson interviewed Ms. Morrison, and

5   together they created a composite sketch of the dark haired assailant.  Dkt. 41-22, at 3-4.  Ms.

6   Morrison indicated she could not describe the blonde attacker well enough to draw a sketch of

7   him. Dkt. 41-1, at 24.  The composite of the dark haired assailant was circulated around the La

8   Center area.  Dkt. 42.

9         *a.   Reports Received that Dark Haired Assailant looks like Mr. Northrop*

10         On January 13, 1993, Clark County Deputy Sheriff Todd Baker completed a supplemental

11   report regarding the incident. Dkt. 42, at 2.  The report stated that he took the composite to the

12   La Center police department, and while there, talked with Reserve Officer Brent Murray.  *Id.*

13   Officer Murray told Deputy Baker that the composite looked like Alan Northrop.  *Id.*  Officer

14   Murray also told Deputy Baker that Mr. Northrop had an associate named Steve Shade, who may

15   resemble the second suspect.  *Id.*  Deputy Baker stated in the report that he found a similarity

16   between Mr. Northrop's mug shot and the composite.  *Id.*  The report stated that the composite,

17   mugs shots of both Mr. Northrop and Mr. Shade, and both men's criminal records were attached

18   to the report.  *Id.*  The report also stated that Mr. Northrop was wanted on an outstanding

19   misdemeanor warrant out of Cowlitz County.  *Id.*

20         Det. Slagle testified at Mr. Davis's May 1993 criminal trial that he got a call from Officer

21   Murray and was told that the composite looked like Mr. Northrop and that Mr. Northrop had an

22   associate named Mr. Shade, who might meet the description of the second suspect. Dkt. 42-7, at

23   3-4.  (In his February 17, 1993 supplemental report, Det. Slagle indicated that, on February 2,

24

1993, he "received information" that in Officer Murray's opinion, the composite drawing appeared to be of Mr. Northrop.  Dkt. 42-1, at 2.)  Det. Slagle reported that he had "received other anonymous calls that the drawing that had been placed in several taverns and stores in La Center, WA appeared to be Alan Northrop." *Id.*  Det. Slagle testified that he pulled booking photos of both Mr. Northrop and Mr. Shade and had two separate photo montages made up.  Dkt. 42-7, at 4.

      b. *Photo Montage of Mr. Northrop and Ms. Morrison's Non-Identification of Mr. Northrop*

Sue Roth of the Clark County Sheriff's Office put together photographs of dark haired suspects, including a picture of Mr. Northrop, for Det. Slagle.  Dkt. 42-2, at 3.  The date on the back of those photographs was January 14, 1993.  *Id.*  She stated that although she doesn't remember specifically what happened in this instance, it is "fair to say" that she would have put them together based on a photograph that Det. Slagle gave her. Dkt. 42-2, at 4.

Det. Slagle testified at Mr. Davis's May 1993 criminal trial that Ms. Morrison was unable to identify any suspect (neither Mr. Northrop nor Mr. Shade) from those montages. Dkt. 42-7, at 4. He now acknowledges that he failed to include her non-identification of Mr. Northrop in any of his reports. Dkt. 41-1, at 8.  Det. Slagle testified in Mr. Northrop's July 1993 trial that after Ms. Morrison was unable to identify Mr. Northrop in the photo montage, he decided to talk with Steve Shade.  Dkt. 43-18, at 3.

      c. *Interview of Steve Shade*

Det. Slagle related in his February 17, 1993 supplemental report that he then found out that Mr. Shade was in custody at the Clark County jail and had him brought to the interview area of the sheriff's office.  Dkt. 42-1, at 2.  (Det. Slagle testified at Mr. Davis's trial, that after he saw Mr. Shade, he realized that he did not match the description of the second suspect, but knew that

1   Mr. Shade knew Mr. Northrop and so still wanted to talk with Mr. Shade.  Dkt. 42-7, at 5.)  Det.

2   Slagle reported in his February 17, 1993 supplemental report that he told Mr. Shade that they

3   were investigating a rape in La Center and that several calls had reported that the composite

4   drawing looked like Mr. Northrop.  *Id.*, at 2-3.  Although Mr. Shade initially denied knowing

5   anything about the rape, the report indicated that Mr. Shade stated that he had seen the composite

6   in a tavern and he and his girlfriend thought the composite looked like Mr. Northrop.  *Id., at 3.*

7   The report further noted that Mr. Shade related that a little before he saw the composite, he saw

8   Mr. Northrop.  *Id.*  Mr. Shade asserted that Mr. Northrop asked Mr. Shade if the cops had talked

9   to him about Mr. Northrop.  *Id.*  Mr. Shade stated that he had not, and when he asked Mr.

10  Northrop, "why?", Mr. Northrop did not answer.  *Id.*  Mr. Shade said that Mr. Northrop had a

11  man with him named Larry Davis, who seemed nervous.  *Id.*  The report stated that Mr. "Shade

12  was asked to describe Larry and his description was very similar to that given by the rape victim

13  of the second suspect that had held her during the rape."  *Id.*  Mr. Shade also relayed that

14  Northrop's girlfriend, Tawny, had a silver Toyota Celica.  *Id.*  Det. Slagle noted in the report that

15  he had information that a "small silver car had been seen parked in the driveway where the rape

16  occurred at approximately the same time the rape occurred."  *Id.*

17          *d.   Ms. Morrison Identifies Mr. Davis in Photo Montage*

18      Det. Ed Kingrey, also assigned to work on the case, filed a supplemental report on February

19  4, 1993.  Dkt. 42-6, at 3.  He reported that he participated in the February 2, 1993 interview of

20  Mr. Shade, and added that Mr. Shade noted that Mr. Davis, had "skin abnormalities on [his] face

21  much the same as the victim had described in suspect #2."  *Id.*  Det. Kingrey reported that Det.

22  Slagle pulled a file photo of Mr. Davis, and had a photo montage put together by the records

23  department.  *Id.*  According to Det. Kingrey, both he and Det. Slagle took the montage to Ms.

24

1   Morrison's home and showed her the montage "after it was explained to her that the suspect may

2   or may not be in the laydown." *Id.* Det. Kingrey reported that Ms. Morrison identified Mr.

3   Davis. *Id.*

4       In his report of Ms. Morrison's February 2, 1993 identification of Mr. Davis in the photo

5   montage, Det. Slagle stated that, after looking at all the pictures, Ms. Morrison "pointed to photo

6   #1 and said, "that's not him." She then pointed to numbers 2, 4, and 5 and said, "that's definitely

7   not him." She then pointed to photograph number 6 and said "that's not him, but that's the one"

8   as she pointed to number 3." Number 3 was the photograph of Larry Davis. Dkt. 42-8, at 2.

9       Ms. Morrison was deposed in this case and although she says that she doesn't remember how

10  long it took her to identify Mr. Davis (and that it doesn't seem like it took that long now), she

11  does not dispute that she testified in 1993 that it took her around 15 or 20 minutes to identify Mr.

12  Davis from the photo montage. Dkt. 42-9, at 4. None of the police reports indicated how long it

13  took Ms. Morrison to identify Mr. Davis.

14        e.  *Interview of Mr. Northrop and Arrest on Other Charges*

15      Det. Slagle related in his February 17, 1993 report that he and Det. Kingrey went to a bar

16  where they located Mr. Northrop on February 2, 1993. Dkt. 43-20, at 5. They arrested him on

17  an outstanding warrant regarding other charges. *Id.* They told him they wanted to talk with him

18  about an incident in the La Center area. *Id.* The report stated that at this point Mr. Northrop

19  appeared to be "very upset and argumentative." *Id.* The detectives told Mr. Northrop that they

20  had had calls identifying him as the man in the composite. *Id.* Mr. Northrop acknowledged that

21  some of his friends "jokingly" told him it looked like him. *Id.* Det. Slagle reported that he told

22  Mr. Northrop that he looked different from when the rape occurred, but did not tell him when it

23

24

1    occurred.  *Id.*  Det. Slagle then noted that Mr. Northrop replied "Well I had my hair cut at least

2    three times since then."  *Id.*

3         *f.   Interview  and Arrest of Mr. Davis*

4         In his February 4, 1993 supplemental report, Det. Kingrey reported that, on February 3, 1993,

5    he asked Mr. Davis to come down to the police station and talk with them, which he voluntarily

6    did.  Dkt. 42-6, at 3.  Det. Kingrey reported that Mr. Davis told them that he had been

7    unemployed and stayed with Mr. Northrop in Woodland, Washington until January 22, 1993.  *Id.*

8    Det. Kingrey reported that Mr. Davis told them that "he was with Northrop on or about 1-11-93

9    and went to Woodland to get a case of beer at the A.M./P.M.  *Id.*  Mr. Davis said he was not sure

10   what time it was but thought around nine-thirty to ten o-clock."  *Id.*  Mr. Davis denied being

11   involved with the crime and agreed to take a polygraph.  *Id.*  According to Det. Kingrey, Mr.

12   Davis's polygraph showed signs of deception and he was placed under arrest.  *Id.*, at 4.

13        *g.   Ms. Morrison Hears of Suspects*

14        In her deposition for this case, taken on May 14, 2013, Ms. Morrison testified that the Friday

15   after she identified Mr. Davis in the photo montage (which was February 2, 1993, a Tuesday), a

16   friend called her and told her they had arrested a Larry Davis for the crime.  Dkt. 42-9 at 6-7.

17   She was also told that Alan Northrop was an additional "name" they had.  Dkt. 42-9, at 12.  Ms.

18   Morrison then called the jail and confirmed that a Larry Davis was in custody, but for burglary.

19   Dkt. 42-9, at 8.  She stated that she wondered "Was it him?  Was it not him?  And he was only

20   booked on the burglary.  So at that point [she] didn't know because there was no information."

21   Dkt. 42-9, at 9-10.  There is no evidence in the record that Det. Slagle or Det. Kingrey knew of

22   these events.

23        *h.   Mr. Davis's Lineup*

24

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 11

On March 11, 1993, a lineup was conducted which included Mr. Davis.  Dkt. 42-13, at 2.  Mr. Davis's attorney was present.  Dkt. 42-13, at 2.  Ms. Morrison viewed the suspects and then each repeated a line Ms. Morrison asserted that the blonde attacker had made during the attack.  *Id.*  According to Det. Slagle's report, Ms. Morrison acknowledged that she was having some difficulty identifying the suspect because of changes in his appearance, but that she believed it was number three; number three was Larry Davis.  Dkt. 42-13, at 3.  The report indicated that on a scale of one to ten (ten being the mostly likely that number three was the suspect), she was a seven or eight that number three (who was Mr. Davis) was the blonde attacker.  *Id.*  Det. Slagle noted in his report that he "noticed that Davis has cut his hair much shorter since he has been in custody that [sic] it was the day he was arrested.  It also appeared to be darker that [sic] [Det. Slagle] remembered it during our last interview on 2-03-93 when he was arrested."  Dkt. 42-13, at 4.

> i.  *Detectives talk with Ms. Morrison before Mr. Northrop's Lineup; Mr. Northrop's Lineup & Arrest*

In her May 14, 2013 deposition, Ms. Morrison testified that on March 17, 1993, Dets. Slagle and Kingrey interviewed her again (after the Davis lineup, but before the Northrop lineup).  Dkt. 42-9, at 15.  During this conversation, Ms. Morrison stated that they told her that she did "o.k.," and "you did it," and "breathe" "[b]ecause [she] was a shaking mess and [she] didn't want to do [the Davis lineup]."  Dkt. 42-9, at 16.  She stated that they told her that they were going to go interview (or had just interviewed) someone they thought to be the dark haired suspect.  Dkt. 42-9, at 16.  Ms. Morrison said, "[t]hey said, we can't do anything with him because you haven't been able to ID him."  Dkt. 42-9, at 17.  She then stated that she thought Mr. Northrop "was in the photo laydown and [she] wasn't able to ID him on that, so the only alternative they have, it

1  sounds like, is if [she] can ID him through a lineup.  So that may be the next step, but they didn't

2  know if they could get him in or what they were gonna do."  Dkt. 42-9, at 17.

3      On April 5, 1993, another lineup was conducted, and this time included Mr. Northrop.  Dkts.

4  42-5, at 8; 42-14, at 2.  Detective Sergeant Craig Randall prepared a report which indicated that

5  attorneys for the prosecution and defense were present.  Dkt. 42-14, at 2.  He reported that, with

6  all the parties present, a viewing window was slid open and within ten seconds, Ms. Morrison

7  turned away and, with an emotional reaction and "teared" voice, said that she did not need to

8  look anymore.  Dkt. 42-14, at 3.  The report further stated that she was urged to be sure, and that

9  she identified #4, which was Alan Northrop.  Dkt. 42-14, at 3-4.

10      Mr. Northrop was arrested on April 7, 1993, for the burglary and rape of Ms. Morrison.  Dkt.

11  28-16, at 2.

12          j.   *Reports from Neighbors of the Home Where Attack Occurred*

13      On April 26, 1993, Det. Slagle filed a supplemental report in which he stated that he and Det.

14  Kingrey contacted Ms. Laila Siebold, one of the neighbors of the house where the rape occurred.

15  Dkt. 41-19, at 3.  Ms. Siebold told Det. Slagle that on the day of the rape, she was outside the

16  house in her field preparing to feed her horses.  Dkt. 41-19, at 3.  (The day the detectives actually

17  talked with her is not in the report).  Ms. Siebold told them that, on the day of the incident, she

18  heard loud horn honking and then saw "a silver-gray, older car leave the area, occupied by three

19  long haired people."  She could not see their faces.  *Id.*  Ms. Siebold stated that the exhaust from

20  the car was loud.  *Id.,* at 4.

21      The April 26, 1993 report also indicated that on April 19, 1993, Det. Slagle and Det. Kingrey

22  talked with Mr. Hans Siebold, a neighbor, who told them that, around 2:00 to 3:00 p.m., he had

23  been driving down their dead end road when he saw an older silver-colored Toyota Celica

24

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 13

1    driving out of the area. *Id.*, at 3.  He reported that the passenger had "longer, dirty blonde hair"

2    and that the driver had "dark, curly, bushy type hair." *Id.*  Det. Slagle reported that he asked if

3    Mr. Siebold could recognize either, and Mr. Siebold thought he could recognize the driver. *Id.*

4    The report stated that Det. Slagle showed Mr. Siebold photographs taken in Cowlitz County of

5    the lineup that included Mr. Northrop. *Id.*  After looking at the photographs for a "short time,"

6    Mr. Siebold stated that "I can't be sure but, it really looked like number four." *Id.*  Mr. Northrop

7    was number four. *Id.*  The report continued, "Mr. Siebold did say that his hair seemed much

8    'fuller' around his face when he saw him in the car.  It should be noted that the victim, Morrison,

9    also said the suspect's hair seemed fuller and longer during the rape incident than it did during

10   the lineup." *Id.*, at 3-4.

11            k.  *Discussion of Cases among Clark County Detectives*

12           Sheriff's Sergeant Craig Randal testified in his deposition for this case that the detectives in

13   Clark County (there were six) worked closely together, and had a round table once a week to

14   discuss their cases. Dkt. 42-5, at 3.  Sgt. Randal recalled discussion of the 1993 rape of Ms.

15   Morrison, and her identity as the victim. Dkt. 42-5, at 3.  He testified that in 1993, in practice,

16   they did not turn over evidence to the defense or prosecution that an individual who was a victim

17   of a rape was being investigated for embezzlement, if the investigators "felt that [the victim] was

18   credible about the incident." Dkt. 42-5, at 9.  Sgt. Randall testified that although it was not a

19   written policy, this  was the "practice" in 1993, and it occurred in other cases as well. *Id.*

20           Mr. Robert W. Shannon, the prosecutor in both cases, testified in his deposition in this case,

21   that he was unaware that Ms. Morrison was under investigation for embezzlement at the time of

22   Mr. Davis and Mr. Northrop's trials. Dkt.42-12, at 4.  He did not remember turning any

23   materials over to the defense regarding such an investigation. *Id.*

24

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 14

1    Det. Slagle testified that he did not personally deliver files to the prosecutor, but would refer

2    the file to case management and they would make sure it got to the prosecutor's officer.  Dkt. 41-

3    1, at 22.

4        3.  Mr. Davis's Trial

5        Mr. Davis was tried before a jury beginning on May 10, 1993, and convicted of first degree

6    burglary, rape, and kidnapping.  Dkt. 28-25.  Mr. Davis was sentenced on July 9, 1993.  Dkt. 28-

7    25, at 30.

8        4.  Mr. Northrop's Trial

9        On June 25, 1993, Mr. Northrop's counsel interviewed Ms. Morrison.  Dkt. 56, at 55.  Mr.

10   Northrop's counsel moved for a continuance of the trial date to allow counsel more time to

11   review all the police reports (he discovered the week before he had only a third of them) and to

12   hire experts.  Dkt. 56, at 53-56.  His motion was denied.  Dkt. 28-27.

13       On July 6-8, 1993, Mr. Northrop was tried before a jury for first degree burglary, rape and

14   kidnapping.  Dkt. 42-12, at 4.  He was convicted on all counts.  Dkt. 28-28.  Mr. Northrop was

15   sentenced on September 14, 1993.  Dkt. 28-27, at 24.

16       5.  Post Conviction Appeals

17       Both Mr. Davis and Mr. Northrop filed appeals with the Washington State Court of Appeals

18   Division II.  Dkts. 28-25, 28-26, 28-27, and 28-28.  The trial court's judgment was affirmed.  *Id.*

19   Mr. Davis filed a petition for review with  the Washington State Supreme Court (Dkt. 28-29); the

20   petition was denied (Dkt. 28-30).  Mr. Davis also filed a Petition for Habeas Corpus in the U.S.

21   District Court for the Western District of Washington (Dkt. 28-31) which was denied (Dkts. 28-

22   34 and 28-35).  Mr. Davis appealed the denial of his habeas corpus petition and the Ninth Circuit

23   Court of Appeals affirmed the district court's denial of the petition.  Dkt. 28-36.

24

6.   <u>Post Conviction DNA testing</u>

In 2004, the Innocence Project Northwest Clinic ("Innocence Project") requested that Clark County retest the DNA that had been collected during the investigation of the 1993 rape.  Dkt. 43-1.  Although Clark County refused to do so voluntarily, on January 31, 2006, the Innocence Project's motion to have the DNA tested was granted by the Clark County Superior Court.  Dkt. 43-16, at 2-4.

In 2006, 2007 and 2009, the Washington State Patrol Laboratory in Seattle tested the DNA collected during the investigation of the 1993 rape of Ms. Morrison.  Dkt. 41-9, at 2.  The testing included DNA testing procedures that were not available in 1993.  *Id.*  DNA from an unknown male was found in the pubic combings.  *Id.,* at 6.  Mr. Northrop and Mr. Davis were excluded as being the sources of this DNA.  *Id.*  DNA profiles from two unknown male individuals were found under Ms. Morrison's fingernails;  Mr. Northrop and Mr. Davis were excluded as being the sources of this DNA.  *Id.*  DNA from an unknown male was also extracted from a cord used to tie Ms. Morrison up.  *Id,* at 7.  Mr. Northrop and Mr. Davis were excluded as being the sources of this DNA.  *Id.*

In 2009, an independent laboratory, Orchid Cellmark, Inc., tested evidence from the incident.  Dkt. 41-10.  That lab concluded that the unidentified male DNA found in the pubic comb extract is consistent with one of the unidentified male's DNA found under Ms. Morrison's fingernails.  *Id.*, at 4.

7.   <u>Proceedings Before Clark County Superior Court in 2010</u>

In 2010, Mr. Davis and Mr. Northrop moved the superior court for new trials based on newly discovered evidence – that the DNA profiles that were found at the crime scene were not consistent with being from either Mr. Northrop or Mr. Davis.  Dkt. 41-13.  Their motion was

1   granted on June 30, 2010, after a hearing on the merits. *Id.* The Clark County Superior Court's

2   opinion stated that it "didn't reach the issue of the taint of the identification due to the

3   overwhelming evidence of the DNA." Dkt. 41-13, at 6. On July 13, 2010, the State stipulated to

4   dismissal of all charges without prejudice. Dkts 41-17.

5       8.  <u>Archived Box Produced to Plaintiffs in 2013 and Other Recent Discovery</u>

6       On March 8, 2013, a box of Det. Slagle's archived files ("archived box") was produced by

7   Clark County, and although there is some confusion in the current record, it appears that this box

8   had not been given to the Clark County Prosecutor's Office in 1993. Dkt. 41, at 3. These files

9   include what are purported to be Det. Slagle's hand written notes that state:

10           Tawny, who works at the Phoenix, is the suspect's girlfriend, she
        4 rapes in La Center area (an up arrow and another symbol) note reported
11           drops them off & comes back & picks them up.
        Larry stopped at La Center Tavern it was brought up in
12           Tawny was living with Bonnie for several months
        Th [sic] guy is related to someone who owns Ray's store (Don Soul)
13           (Clara bartender at tavern)
        Tillet
14           Bonnie's dad Richard lives in La Center Timmens landing . . .
        /Kathy Fisher/ info.
15           2 weeks ago saw two men similar description . . .
        Svanson area park – pay $1.00 and write license number and # in vehicle you
16           can see [the residence where the incident took place] from park.

17   Dkt. 42-10, at 2-3. Another hand written note dated January 13, 1993, stated: "possible rape

18   suspects:  1) Joe West (Jesse) West dark haired." Dkt. 42-10, at 4. A hand written note entitled

19   "La Center Rape Info." with the name "Joe Berry" and a phone number and address, the name

20   "Pat Kahn" with a phone number, and the name "Jesse West (a symbol of some kind) Scott

21   Grant on 26th Ave. work together, tree cutting & trimming both have drug problems used to drive

22   brown pickup." Dkt. 42-10, at 5. This archived box included an application for protective order,

23   dated February 12, 1991, that Ms. Morrison had filed against Richard Stratton (Ms. Morrison's

24

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 17

ex-husband). Dkt. 42-10, at 6-9. Lastly, the archived box contained a three page document entitled "Larry Wayne Davis Followup [sic] Needed."*Id.* This document appears to be a list of things to do connected with the investigation including: interviewing the victim regarding prior activities in the North county area, contacting "Rod Peterson (Defendant supposedly stayed at his house on the night prior)," recontacting Northrop's girlfriend, recontacting Steve Shade, and "see[ing] if you can rule out boyfriend, associates, ex-husband, Richard Todd Stratton?" Dkt. 42-10, at 10-12.

An additional police report regarding the incident also surfaced during the discovery in this case; the Clark County Prosecutor was unaware of this report before it was produced in this case. Dkt. 42-12, at 7. That report stated that, on February 28, 1993, Clark County Officer Jana Anderson took an anonymous call from a man (now identified as Gregory Usery) who said that he had seen the composite drawing (which was of the dark haired attacker) that had been made in the criminal case. Dkts. 41-14 and 42-11. Mr. Usery reported that he recognized the man in the drawing as an acquaintance named Monte Ollom. *Id.* He reported that he knew Mr. Ollom because they used to work together and that he still saw him a few times a week. *Id.* Mr. Usery relayed that he thought Mr. Ollom was living with two other individuals, one of whom was believed to be a child molester. *Id.* The report stated "[r]efer this information to Detective Slagle for additional follow up." Dkt. 41-14, at 8. Officer Anderson stated that, after writing the report, she turned it into the records department (Dkt. 41-23, at 5-6) which was then supposed to file the report under the case number (Dkt. 42-5, at 16). She stated that she added the line regarding referral to Det. Slagle so that the sergeant in the records department would know to whom to send it. Dkt. 41-23, at 6.

1   Curtis Shelton, Mr. Northrop's defense attorney at the trial, stated that he was not given the

2   report regarding Mr. Ollom.  Dkt. 41-15, at 2.  Mr. Shelton stated that, had he been aware of this

3   other suspect, he would have pursued further investigation of that lead.  *Id.*

4   **B.  PROCEDURAL HISTORY**

5   Plaintiffs filed this case on August 25, 2012.  Dkt. 1.  They make federal claims against both

6   Clark County and Det. Slagle for violation of their due process right to a fair trial under the 6th

7   and 14th Amendments of the United States Constitution pursuant to 42 U.S.C. § 1983.  Dkt. 22.

8   Plaintiffs assert state law claims against Clark County and Det. Slagle for negligence, against

9   Clark County for negligent training, supervision, and retention and against Clark County and

10  Det. Slagle for intentional infliction of emotional distress or "outrage."  *Id.*  Plaintiffs seek

11  damages, including punitive damages, attorneys' fees, and costs.  *Id.*

12  **C.  PENDING MOTION**

13  Defendants move for Summary Judgment, arguing that as to Plaintiffs' federal claims:  1)

14  collateral estoppel precludes re-litigation of Plaintiffs' claims under *Brady* and the Fourteenth

15  Amendment, 2) no *Brady* violation occurred as to the investigation of Ms. Morrison for

16  embezzlement because Plaintiffs cannot show disclosure would change the outcome of the cases,

17  3) no *Brady* violation occurred as to Northrop in regard to the investigation of Ms. Morrison for

18  embezzlement because the completed investigation was turned over to the Clark County

19  Prosecutor's Office on June 14, 1993, three weeks prior to the Northrop trial, 4) no *Brady*

20  violation occurred regarding the failure to report the precise date of the non-identification of

21  Northrop because the jury discovered the real date in the Northrop trial during deliberation and

22  Davis cannot show what impact the precise date of the non-identification of Northrop would

23  have had on his trial, 5) Det. Slagle is entitled to qualified immunity as to the *Brady* violation

24

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 19

1  related to the precise date of non-identification of Northrop, 6) no *Brady* violation occurred as to

2  the "other suspects" because Plaintiffs cannot show that these suspects were linked to

3  perpetration of the crime, 7) Det. Slagle is entitled to qualified immunity for the Fourth and

4  Fourteenth Amendment claims because there was probable cause to arrest both Plaintiffs, and 8)

5  Plaintiffs' claims against Clark County should be dismissed because Plaintiffs cannot show that

6  there is a policy, custom, or practice was in place that violated their constitutional rights, or that

7  such a policy, custom, or practice caused their damages.  Dkts. 25 and 51.  As to Plaintiffs' state

8  law claims of negligence, Defendants argue that:  1) there is no recognized cause of action for

9  negligent investigation in Washington and so that claim should be dismissed, and 2) Plaintiff's

10  state law claims are time-barred.  *Id.*  Mr. Davis and Mr. Northrop oppose the motion.  Dkt. 50.

11  Oral argument has been heard and the matter is ripe for decision.

12  **D.  ORGANIZATION OF THE OPINION**

13  This opinion will first address Defendants' arguments regarding the federal claims and then

14  turn to the arguments on the state law claims.

15  **II.  DISCUSSION**

16  **A.  SUMMARY JUDGMENT STANDARD**

17  Summary judgment is proper only if the pleadings, the discovery and disclosure materials

18  on file, and any affidavits show that there is no genuine issue as to any material fact and that the

19  movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c). The moving party is

20  entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

21  showing on an essential element of a claim in the case on which the nonmoving party has the

22  burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

23  of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

24

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 20

1   for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

2   (1986)(nonmoving party must present specific, significant probative evidence, not simply "some

3   metaphysical doubt."). *See also* Fed.R.Civ.P. 56(e). Conversely, a genuine dispute over a

4   material fact exists if there is sufficient evidence supporting the claimed factual dispute,

5   requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty*

6   *Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors*

7   *Association*, 809 F.2d 626, 630 (9th Cir. 1987).

8         The determination of the existence of a material fact is often a close question. The court

9   must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

10  e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect.*

11  *Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor

12  of the nonmoving party only when the facts specifically attested by that party contradict facts

13  specifically attested by the moving party. The nonmoving party may not merely state that it will

14  discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

15  to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

16  Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not

17  be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

18  **B. FEDERAL CLAIMS**

19        1. Collateral Estoppel

20        "State law governs the application of collateral estoppel or issue preclusion to a state

21  court judgment in a federal civil rights action." *Ayers v. City of Richmond*, 895 F.2d 1267, (9th

22  Cir. 1990)(*internal citations omitted*). Under Washington law, collateral estoppel requires that

23  there be:

24

(1) identical issues; (2) a final judgment on the merits; (3) the party against whom the plea is asserted must have been a party to or in privity with a party to the prior adjudication; and (4) application of the doctrine must not work an injustice on the party against whom the doctrine is to be applied.

*Schroeder v. Excelsior Management Group, LLC*, 177 Wash.2d 94, 108 (2013) (*internal quotation omitted*).  In Washington, collateral estoppel bars re-litigation of "issues actually litigated" and "necessarily decided" in a prior adjudication. *City of Arlington v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 164 Wn.2d 768, 792 (2008).

The parties contest the first two requirements (as will be discussed below).  The parties do not meaningfully contest the third requirement.  As to the fourth requirement, under Washington law, "the injustice component is generally concerned with procedural, not substantive irregularity."  *Christensen v. Grant County Hosp. Dist. No. 1*, 152 Wash.2d 299, 309 (2004)(*internal citations omitted*).  Washington requires that the "party against whom the doctrine is asserted must have had a full and fair opportunity to litigate the issue in the first forum.  Accordingly, applying collateral estoppel may be improper where the issue is first determined after an informal, expedited hearing with relaxed evidentiary standards."  *Id.* (*citing State v. Vasquez*, 148 Wash.2d 302, 303 (2002)).  In this Order, the fourth requirement will only be discussed if the first two requirements are met.

Clark County and Det. Slagle argue that each of the Plaintiffs is collaterally estopped from re-litigating their due process claims based on overly suggestive identification procedures, their due process claims based on *Brady* violations regarding the failure to disclose the date of non-identification of Mr. Northrop in the photo montage, and failure to disclose the embezzlement investigation of Ms. Morrison.  Dkt. 25.  Each of these will be examined in turn.

  a. *Collateral Estoppel Regarding Due Process Claims Based on Overly Suggestive Identification Procedures*

1    "To determine whether an identification procedure violates a defendant's due process

2    rights, a court must consider 'whether under the 'totality of the circumstances' the identification

3    was reliable even though the confrontation procedure was suggestive.'"  *U.S. v. Drake,* 543 F.3d

4    1080, 1088 (9th Cir. 2009)(*quoting  Neil v. Biggers*, 409 U.S. 188, 199 (1972)).  The factors to

5    be considered in the Ninth Circuit "include the opportunity of the witness to view the criminal at

6    the time of the crime, the witness' degree of attention, the accuracy of the witness' prior

7    description of the criminal, the level of certainty demonstrated by the witness at the

8    confrontation, and the length of time between the crime and the confrontation."  *Id.*

9             i.   Whether Mr. Davis is collaterally estopped from making his current
                   claim that the identification procedures (the photo montage and live
10                 line up) violated his due process rights?

11    The County and Det. Slagle's motion (Dkt. 25) as to this claim should be granted and Mr.

12    Davis should be barred from re-litigating this claim.  The first two collateral estoppel

13    requirements are met.  Mr. Davis's current claim that the identification procedures violated his

14    due process rights are issues identical to those raised in the criminal proceedings and resulted in

15    a final judgment on the merits.  In Mr. Davis's Opening Brief in his 1993 appeal to the

16    Washington State Court of Appeals, Division II, he argued:

17        The identification procedures used in the initial drawing and photo procedure was
          flawed:
18        Once the co-defendant in this case was apprehended, two photo laydowns of six
          photos each were prepared.  She could not select Alan Northrop from either
19        laydown.  She also could not identify a friend of Alan's named Steve Shade as the
          suspect from another six photo laydown.  Apparently Steven Shade fingered Larry
20        Davis as a friend of Alan Northrop.  Another six photo laydown was done and
          defendant [Mr. Davis] was identified. . . .
21        The primary issue then, of the victim's identification of defendant from the photo
          montage, is the actual reliability of the identification.  Victim here appears to have
22        had fair opportunity both to observe the attackers.  She had a high degree of
          attention and seemed to display a good level of certainty at the actual line-up.
23        More open to question is the accuracy of her prior description, which was not
          good at the time of the crime and which was only developed when she spoke to

24

1    Detective Slagle at the hospital.  An extensive record was not made of when the
     line-up and laydown were done, but apparently photo laydowns were done in
2    March and the line-up about April 5, 1993.
     A possible contributing effect is that of the sheer stress of the case itself on the
3    victim, and the desire to put it behind her. . . Detective Slagle went to the point of
     traveling to the victim's home to show her laydown photos in the hopes she would
4    identify one. . . .
     Still, most troublesome is the possibility that [Mr. Davis's] identification was
5    tainted by the persistence of police investigative work. Out of an available
     population of perhaps 350,000 it seems highly suspicious that Alan Northrop
6    would be one of only a dozen laydown suspects, and Larry Davis one of only
     another half-dozen.  Statistically there are problems with the state's case.  The
7    laydown and the line-up were not inherently reliable and the identification of
     defendant should be excluded.
8
Dkt. 28-25, at 36-39 (*internal citations to the record omitted*).
9
     In its decision affirming the conviction and sentence, the Washington State Court of
10
Appeals, Division II, found that "[n]or is there merit to Davis's contention that the trial court
11
should have granted him a new trial because the victim's identification of him is 'suspect.'
12
Davis has failed to show any error in the identification procedures."  Dkt. 28-26, at 6.  It further
13
held,
14
     The trial court did not err in admitting evidence that the victim identified Davis in
15   a photo montage and lineup nor did it err in allowing her to identify Davis in
     court.  Davis argues that the trial court violated his constitutional right to due
16   process when it admitted the victim's photo and lineup identifications of him
     when it allowed the victim to identify him in court.  Davis asserts that the victim's
17   identification did not satisfy the *Stovall v. Denno*, 388 U.S. 293 (1967) criteria'
     i.e. the identification was not "inherently reliable."  Davis mistakes his burden of
18   proof.
     To obtain a new trial based upon faulty identification procedures, it is not the
19   State's burden to show that the identification procedures are "inherently reliable."
     Rather the burden is on the defendant to show that identification procedures were
20   "so impermissibly suggestive as to give rise to a very substantial likelihood of
     irreparable misidentification.  *Simmons v. U.S.*, 88 U.S.967 (1968) . . . The
21   inquiry ends if no suggestiveness is present, and in such a case, the uncertainty or
     inconsistency in identification testimony goes only to its weight, not its
22   admissibility. . . .
     Davis fails to demonstrate that the identification procedures were suggestive.
23   Montages are a proper procedure for identification and the presentation of a series
     of photographs whose arrangement does not suggest whom is the suspect is a fair
24

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 24

1    test. . . Minor differences in appearances of photographs do not constitute an
     impermissibly suggestive procedure. . . Davis has not argued, nor has he
2    presented any evidence, that his physical characteristics are unique among the six
     photos displayed.  Similarly, Davis has not argued, nor has he presented any
3    evidence, that his physical characteristics differed materially from the physical
     characteristics of the other suspects who participated in the lineup.  Thus, he fails
4    to meet his burden of showing that the identification procedures were suggestive,
     much less impermissibly so.

5

6    Dkt. 28-26, at 7-8.  Mr. Davis's due process claim regarding the identification procedures were

7    "issues actually litigated" and "necessarily decided" in his first appeal of his conviction.  *City of*

8    *Arlington*, at 792.  Accordingly, the first two requirements are met, as is the third (uncontested)

9    requirement of privity.

10          The fourth requirement, that application of collateral estoppel not work an injustice on

11   Mr. Davis, has also been met.  There is no evidence of a procedural irregularity.  *Christensen,* at

12   309.  There is no evidence that Mr. Davis did not have a "full and fair opportunity to litigate the

13   issue in the first forum."  *Id.*  Mr. Davis is collaterally estopped from re-litigating his due process

14   claim based on the procedures used to identify him.

15          ii.    Whether Mr. Northrop is collaterally estopped from making his current
                   claim that the identification procedures (the photo montage and live line
16                 up) violated his due process rights?

17          As was the case with Mr. Davis, Mr. Northrop's claim that the identification procedures

18   used violated his due process rights is barred.  The first two requirements are met:  In Mr.

19   Northrop's 1994 appeal in the Washington State Court of Appeals, Division II, he argued in

20   regard to the procedures used to identify him and Mr. Davis:

21          Morrison viewed a photo montage and a lineup involving Larry Davis, a friend of
            the defendant.  Morrison also listened to the voice of Davis others in the lineup.
22          Morrison identified Davis as the taller of her attackers.
            Morrison viewed Northrop during a lineup procedure on March 11, 1993.
23          Northrop was the only person whose likeness was repeated between the montage
            procedure and the lineup.  After viewing part of the lineup for approximately two

24

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 25

(2) seconds, Morrison identified Northrop.  Morrison also identified Northrop at trial.

Throughout her testimony, and during various interviews with investigators, Morrison gave widely differing accounts of her ability to describe and recognize her attackers.  By the time she testified at trial, however, she had "no doubt" of her ability to identify [Mr. Northrop].

Dkt. 28-27, at 20 (*internal quotations and citations to the record omitted*).  He continued,

The trial court, over [Mr. Northrop's] pre-trial and trial objections, permitted the State to introduce evidence that a friend of the defendant's, Larry Davis, had been identified as a participant in the rape.  The State argued that the 'connection' between Davis and Northrop, combined with evidence of Davis' involvement, was evidence of Northrop's guilt.  Over objection, the trial court also admitted Morrison's pre-trial and trial identifications of Northrop as her shorter attacker.

*Id.,* at 23-24.  He urged,

The admission of identification evidence which has been corrupted by pretrial procedures violates a defendant's right to due process under the Federal and State constitutions.  The evidence will be excluded if the defendant establishes that the procedures used were unnecessarily suggestive and 'created a substantial likelihood of irreparable misidentification.'

The suggestiveness inherent in the identification procedures used in this case flow from the repeated showings of one individual to a victim who has had a limited opportunity to observe her attacker.  This repeated showing of the same individual 'was almost certain to leave the witness with a recollection based on the photograph instead of her initial observations. . .

Morrison's identification of Northrop is not reliable.  Morrison indicated her opportunity to view the suspects without the distraction of a physical struggle was 'split' second.  After the initial struggle, at which Morrison's face was deliberately held in a way to obstruct her vision, her eyes were covered with electrician's tape. . .

Morrison's initial descriptions of her attackers were vague and sparse on detail.  She could not identify Northrop in the photo montage, she refused to work on a sketch of her second attacker because she could not identify him.  Morrison's level of certainty as to identification increased only after repeated viewings of the suspects in the photo montages and lineups. . . Finally, the length of time between the initial attack and lineup procedure was lengthy – two (2) months in Alan Northrop's case. . . . The evidence presented regarding the identification of Alan Northrop shows a progression from uncertainty to certainty, based upon tainted, repetitive procedures.  Those procedures denied Northrop due process of law . . .

*Id.* (*internal quotations and citations omitted*).

1    In their decision affirming Mr. Northrop's the conviction and sentence, the Washington

2  State Court of Appeals, Division II, held that Mr. Northrop's line-up procedure was not

3  impermissibly suggestive.  Dkt. 28-28, at 8.  His appeal for relief was denied.  *Id.*

4    Accordingly, the first two requirements of collateral estoppel are met:  the issues before

5  the Washington State Court of Appeals, Division II are identical to those raised here and were

6  finally decided.  The third requirement is uncontested, and the last collateral estoppel

7  requirement, that application of collateral estoppel not work an injustice on Mr. Northrop, has

8  also been met.  There is no evidence of a procedural irregularity or evidence that Mr. Northrop

9  did not have a "full and fair opportunity to litigate the issue in the first forum." *Christensen,* at

10  309.  Accordingly, Mr. Northrop is barred from re-litigating his due process claim based on the

11  procedures used to identify him.  The County and Det. Slagle's motion (Dkt. 25) as to this claim

12  should be granted.

13        *b.   Collateral Estoppel Regarding Due Process Claims Based on Brady*

14    A defendant's due process rights are violated "if the government fails to disclose

15  evidence that is materially favorable to the accused." *Youngblood v. West Virginia*, 547 U.S.

16  867, 869 (2006)(*citing Brady  v. Maryland,* 373 U.S. 83 (1963)).

17        Such evidence is material if there is a reasonable probability that, had the
        evidence been disclosed to the defense, the result of the proceeding would have
18        been different although a showing of materiality does not require demonstration
        by a preponderance that disclosure of the suppressed evidence would have
19        resulted ultimately in the defendant's acquittal.  The reversal of a conviction is
        required upon a showing that the favorable evidence could reasonably be taken to
20        put the whole case in such a different light as to undermine confidence in the
        verdict.

21
*Id.*, at 870 (*internal quotations and citations omitted*).  The obligation under *Brady* "is the
22
obligation of the government, not merely the obligation of the prosecutor." *United States v.*
23
*Blanco*, 392 F.3d 382, 393 (9th Cir. 2004).
24

1    Clark County and Det. Slagle contend that the Plaintiffs are barred from bringing two of

2    their *Brady* based due process claims:  the failure to disclose the date of Ms. Morrison's non-

3    identification of Mr. Northrop in the photo montage and the failure to disclose the fact that Ms.

4    Morrison was under investigation for embezzlement at the time of these events.  Dkt. 25.  The

5    bar as to each of the Plaintiffs will be examined.

6

        i.  Whether Mr. Northrop is collaterally estopped from making his current claim that the failure to disclose Ms. Morrison's non-identification of

7           him in the photo montage three days after the rape violated his *Brady* based due process rights?

8

9    The County and Det. Slagle's motion as to this claim should be granted and Mr. Northrop

10    should be barred from re-litigating this claim.  Dkt. 25.  The first two collateral estoppel

11    requirements are met.  Mr. Northrop's current claim, that his due process rights as defined in

12    *Brady* were violated when the State failed to disclose the date Ms. Morrison was unable to

13    identify him in the photo montage, is identical to that raised in the criminal proceedings and

14    resulted in a final judgment on the merits.  On August 10, 1993, Mr. Northrop filed a

15    "Memorandum in Support of Defendant's Post-Verdict Motions" in which he argued that:

16        The evidence implicating the defendant in the crimes charged consisted primarily, if not exclusively, of the victim's eyewitness identifications of him which occurred at a lineup at the Cowlitz County jail on April 5, 1993, and at trial.

17        During the pretrial discovery process the defendant's counsel attempted to investigate all factors relating to the accuracy of these identifications.  The victim

18        was interviewed and police officers who investigated the case were interviewed. Discovery motions were made at an omnibus hearing.

19        During the course of the discovery process defense counsel learned that the lead investigating officer, Detective Don Slagle, had at some point in time showed the

20        victim a 6-person photo montage (admitted at trial as Exhibit No. 6) containing clear color photographs of the front and side views of the defendant's fact.  It was

21        also learned that the victim, after a "careful" examination of the montage, did not identify the photos of the defendant as the person who raped her.  No written

22        report of this event was ever prepared by Slagle or any other police investigator. Defense counsel interviewed the victim, Kari Morrison, on June 25, 1993.  During

23        the interview Ms. Morrison stated that she recalled being shown the photo montage at issue by Detective Slagle.  Although she could not recall specifically

24

1    when it was shown to her, she said she believed that it was "weeks" after the rape occurred.

2    When Detective Slagle was interviewed by defense counsel on June 30, 1993, Slagle stated that the montage was prepared and presented to Kari Morrison after

3    he had interviewed Steven Shade, a friend of the defendant's brother, who provided Slagle with information suggesting that the defendant had committed the

4    rape.  According to a police report prepared by Detective Slagle, which had previously been provided to defendant's counsel, Slagle's first contact with

5    Steven Shade occurred on February 2, 1993, over three weeks after the rape. Slagle confirmed that he had not prepared a report or otherwise memorialized the

6    facts surrounding the presentation of the montage to Kari Morrison.  . . . From the information disclosed by the state to the defense regarding the

7    presentation of the montage in issue, defense counsel reasonably concluded that the montage was presented to Kari Morrison at least 3 weeks after the rape

8    occurred. . . After the trial, it was learned that the montage had been prepared by the Sheriff's

9    Office on January 14, 1993, only 3 days following the rape and only 1 day after the composite drawing of the rape suspect, later identified by Kari Morrison as the

10   defendant, was completed. The timing of the presentation of this montage is material evidence favorable to

11   the defense.  The state's actions in failing to disclose this evidence to the defendant prior to trial, and in providing false, inaccurate, and perhaps untruthful

12   information to the defense regarding the timing of the preparation and presentation of the montage to the victim deprived the defendant of his due

13   process right to a fair trial.  The court should, at the very least, grant him a new trial.

14
     Dkt. 28-24, at 2-4.  Mr. Northrop argued that the failure of both the prosecutor and the detectives

15
     to disclose that Ms. Morrison was unable to identify him in the photo montage three days after

16
     the rape was a violation of his due process rights under *Brady v. Maryland*. *Id.,* at 5-11.  Mr.

17
     Northrop's motion was denied.  Dkt. 28-27, at 24.

18
          On October 24, 1994, Mr. Northrop filed his brief in his appeal challenging his

19
     conviction and sentence in the Washington State Court of Appeals, Division II.  Dkt. 28-27, at 2.

20
     As to the failure to disclose the date of Ms. Morrison's initial non-identification of him, he

21
     argued:

22
          Three (3) days after the incident, Sheriff's Deputy Don Slagle prepared a photo

23        montage which contained photos of the defendant, Alan Northrop.  Slagle showed the montage to Morrison, who looked at it "for some time."  Morrison could not

24

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 29

1
identify anyone in the montage as her attacker.  Slagle entered the montage in
evidence, but did not prepare a report of this contact.  Slagle later told defense

2
investigators and testified that this montage was prepared and viewed weeks after
the incident, after Northup had already been developed as a suspect.  [Mr.

3
Northrop] did not learn of the actual date the montage was prepared until after
[his] trial was completed.

4
The State's misrepresentation of the dates the photo montage was prepared and
presented to the victim materially prejudiced [Mr. Northrop's] ability to defend

5
himself. . . .In this case, the only eyewitness to the crime was unable to identify
the [Mr. Northrop's] photograph in a montage presented to her by police within

6
days of the crime having occurred.  This evidence is highly probative to the
reliability of the identification.

7

8
*Id.,* at 19 and 42-44.  In their decision affirming Mr. Northrop's the conviction and sentence, the

9
Washington State Court of Appeals, Division II, rejected Mr. Northrop's argument that his

10
constitutional rights were violated and that he did not receive a fair trial when the State failed to

11
disclose the date that Ms. Morrison was not able to identify him in the initial photo montage.

12
Dkt. 28-28 at 13.  It held:

13
Northrop claims that he was denied a fair trial by the State's misrepresentation of
the date on which it presented the photo montage to [Ms. Morrison]. He contends

14
that before trial, the State told him that it showed [Ms. Morrison] the montage
several weeks after the attack and that this was inaccurate.
Although the failure to disclose evidence pertaining to the reliability of a key

15
State witness may violate due process rights, the grant of a new trial is not
automatic. *Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 766, 31 L.

16
Ed. 2d 104 (1972).  The right to a new trial depends upon whether the new
evidence is material, *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct.1194, 10 L.

17
Ed. 2d 215 (1963), and whether it would, in any reasonable likelihood, have
changed the verdict. *Giglio*, 405 U.S., at 154.

18
Here, the State neither destroyed nor withheld evidence. The defense knew in
advance of trial that [Ms. Morrison] had failed to identify Northrop in the photo

19
montage. The record does not show the State hid or misstated the date.  Deputy
Slagle, the lead investigator, testified that he simply could not remember the exact

20
date.  Nor has Northrop demonstrated how knowledge of the precise date of the
showing would have changed the outcome of the trial. Without some evidence of

21
bad faith by the State, we find no breach of the State's duty to preserve evidence
or violation of Northrop's due process rights.

22
Dkt. 28-28, at 13-14.

23

24

1    Both the Clark County Superior Court and Washington State Court of Appeals, Division

2    II considered and actually decided the identical issue Mr. Northrop raises here, so the first two

3    requirements are met.  As above, the parties do not contest that they are in privity, so the third

4    requirement is met.  Nor is there any evidence of procedural "irregularities" that would make

5    collaterally estopping Mr. Northrop's claim unjust.  The fourth collateral estoppel requirement is

6    met.  Accordingly, Mr. Northrop is barred from relitigating whether his *Brady* due process rights

7    were violated when the State failed to turn over the exact date of the non-identification of Mr.

8    Northrop in the photo montage.

9                        ii.    Whether Mr. Davis is collaterally estopped from making his
                                current claim that the failure to disclose Ms. Morrison's non-
10                               identification of Mr. Northrop in the photo montage three days
                                after the rape violated his *Brady* based due process rights?

11

12    Collateral estoppel does not bar Mr. Davis from asserting this claim.  In arguing that Mr.

13    Davis is collaterally barred from re-litigating this issue, Clark County and Det. Slagle point to

14    Mr. Davis's pleadings filed regarding his direct appeal and habeas petition.  Dkt. 25.

15    On September 16, 1993, Mr. Davis filed his Opening Brief appealing his conviction and

16    sentence with the Washington State Court of Appeals, Division II.  Dkt. 28-25.  As to the

17    identification of Mr. Northrop, Mr. Davis argues that the identification procedure used in the

18    initial drawing of Mr. Northrop was flawed.  Dkt. 28-25, at 36-37.  His brief notes that "[o]nce

19    [Mr. Northrop] was apprehended two photo laydowns of six photos each were prepared.  [Ms.

20    Morrison] could not select Alan Northrop from either laydown."  Dkt. 28-25, at 36-37.  Nothing

21    further is raised.  In their decision affirming the conviction and sentence, the Washington State

22    Court of Appeals, Division II, did not discuss the issue.  Dkt. 28-26.

23    The pleadings filed in regard to Mr. Davis's direct appeal do not address Det. Slagle's, or

24    the County's, failure to disclose Ms. Morrison's failure to identify Mr. Northrop three days after

1   the incident.  Accordingly, these pleadings do not meet the first or second requirement under

2   collateral estoppel.

3          Mr. Davis filed a Petition for Habeas Corpus in 1997.  Dkt. 28-31, at 2.  In his petition,

4   he argued that:

5          The only eyewitness to the crime was unable to identify the defendant's
           photograph in a montage presented to her by police within days of the crime
6          having occurred.  This evidence is highly probative to the reliability of the
           identification.  Yet this evidence was misrepresented to the defense by the lead-
7          investigating officer, who indicated that the view had in fact occurred weeks after
           the incident.

8   Dkt. 28-31, at 11, (*internal citations omitted*).  To the extent that Mr. Davis intended to raise the

9   issue of Ms. Morrison's non-identification of Mr. Northrop three days after the incident as a

10  violation of Mr. Davis's rights, no ruling on the issue was made.  The Report and

11  Recommendation on his petition stated that the only claim presented was that the pretrial

12  identification of petitioner [Mr. Davis] in a photo montage and lineup was improperly

13  suggestive.  Dkt. 28-34, at 2.  It does not make any decision on the issue of the late disclosure of

14  the date of Ms. Morrison's initial non-identification of Mr. Northrop.  Accordingly, there was no

15  final decision on the merits on this issue, so the second prong under the collateral estoppel

16  doctrine was not met.  Mr. Davis is not barred from making this claim.

17              iii.    Whether Mr. Northrop and Mr. Davis are collaterally estopped
                       from making their *Brady* claim regarding the non-disclosure of Ms.
18                     Morrison being under investigation for embezzlement at the time?

19          Neither Mr. Northrop nor Mr. Davis is collaterally estopped from arguing that his *Brady*

20  rights were violated when the government failed to disclose that Ms. Morrison was being

21  investigated for embezzlement at the time of the rape and trials.  As to Mr. Northrop, the

22  Defendants point to the June 8, 1998, Clark County Superior Court's denial of Mr. Northrop's

23

24

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 32

1    motion for a new trial.  Dkt. 25.  The motion itself is not in the record, however, and the brief

2    opinion issued by the court states that:

> 3      [Mr. Northrop] has moved the Court for relief claiming newly discovered
> evidence and is asking it to grant right of new trial because such newly discovered
> 4      evidence would present substantial facts which could likely change the outcome
> of the previous jury's verdict.  [Mr. Northrop] does not claim misconduct of the
> 5      prosecutor nor specific acts of misconduct.  However, [he] does allege that the
> victim in this matter has been convicted of larceny in 1981 in Multnomah County,
> 6      Oregon. . . . . The 1994 and 1997 convictions occurred after the trial.  Trials must
> have some degree of finality, and we cannot seek to reopen based on evidence
> 7      that only attacks credibility for events that occurred after the trial.  One does not
> know what lasting effects or what acting out may take place as a direct effect of
> 8      such a traumatic experience as described in this case.

9    Dkt. 28-33, at 2-3.  The events giving rise to the investigation of Mr. Morrison for embezzlement

10    occurred before the rape and both trials.  There is no showing that the issues raised here are

11    identical to the issue discussed in this order or that the issue raised here was finally decided.  Mr.

12    Northrop is not collaterally barred from making this claim.

13      As to Mr. Davis, the second collateral estoppel requirement, a final judgment on the

14    merits, is not met.  Although in his Petition for Review to the Washington Supreme Court, he

15    argued that the State violated his rights when it failed to disclose that Mr. Morrison was involved

16    in four counts of theft before January of 1993 (Dkt. 28-29), his petition for review was denied by

17    the Washington State Supreme Court without comment.  Dkt. 28-30, at 2.  The court did not

18    address the merits of his petition.  *Id.*  He is not collaterally estopped from this claim.

19      2.  Due Process Claims based on *Brady* Violations and Qualified Immunity

20      In order to state a claim under 42 U.S.C. § 1983, a complaint must allege that (1) the

21    conduct complained of was committed by a person acting under color of state law, and that (2)

22    the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or

23    laws of the United States.  *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other*

24

1    *grounds, Daniels v. Williams*, 474 U.S. 327 (1986).  Section 1983 is the appropriate avenue to

2    remedy an alleged wrong only if both of these elements are present.  *Haygood v. Younger*, 769

3    F.2d 1350, 1354 (9th Cir. 1985), *cert. denied*, 478 U.S. 1020 (1986).

4           Defendants in a Section 1983 action are entitled to qualified immunity from damages for

5    civil liability if their conduct does not violate clearly established statutory or constitutional rights

6    of which a reasonable person would have known.  *Pearson v. Callahan*, 129 S.Ct. 808, 815

7    (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity balances

8    two important interests: the need to hold public officials accountable when they exercise power

9    irresponsibly and the need to shield officials from harassment, distraction, and liability when

10   they perform their duties reasonably. *Harlow v. Fitzgerald*, 457 U.S. at 815. The existence of

11   qualified immunity generally turns on the objective reasonableness of the actions, without regard

12   to the knowledge or subjective intent of the particular official. *Id*. at 819. Whether a reasonable

13   officer could have believed his or her conduct was proper is a question of law for the court and

14   should be determined at the earliest possible point in the litigation.  *Act Up!/Portland v. Bagley*,

15   988 F.2d 868, 872-73 (9th Cir. 1993).

16          In analyzing a qualified immunity defense, the Court must determine: (1) whether a

17   constitutional right would have been violated on the facts alleged, taken in the light most

18   favorable to the party asserting the injury; and (2) whether the right was clearly established when

19   viewed in the specific context of the case.  *Saucier v. Katz*, 121 S.Ct. 2151, 2156 (2001).  "The

20   relevant dispositive inquiry in determining whether a right is clearly established is whether it

21   would be clear to a reasonable officer that his conduct was unlawful in the situation he

22   confronted." *Id*.  While the sequence set forth in *Saucier* is often appropriate, it should no longer

23   be regarded as mandatory.  *Pearson v. Callahan*, at 129 S.Ct at 811.  "The judges ... should be

24

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 34

1  permitted to exercise their sound discretion in deciding which of the two prongs of the qualified

2  immunity analysis should be addressed first in light of the circumstances in the particular case at

3  hand." *Id.*

4      Clark County and Det. Slagle move to have two of the bases of the asserted *Brady*

5  violations dismissed: that of the failure to turn over information about the investigation of Ms.

6  Morrison for embezzlement and the failure to turn over the date of Ms. Morrison's non-

7  identification of Mr. Northrop.  Dkt. 25.  Their arguments will be addressed using the two

8  pronged *Saucier* analysis where appropriate.

9          *a.   Failure to Turn Over Information About the Investigation of Ms. Morrison -*
            *Violation of Dr. Davis and Mr. Northrop's Due Process Rights?*

10     "A police officer's failure to preserve or collect potential exculpatory evidence does not

11 violate the Due Process Clause unless the officer acted in bad faith." *McSherry v. City of Long*

12 *Beach*, 584 F.3d 1129, 1135 (9th Cir. 2009)(*citing Cunningham v. City of Wenatchee*, 345 F.3d

13 802, 812 (9th Cir.2003)).  A defendant's due process rights are violated, however, "if the

14 government fails to disclose evidence that is materially favorable to the accused." *Youngblood v.*

15 *West Virginia*, 547 U.S. 867, 869 (2006)(*citing Brady  v. Maryland,* 373 U.S. 83 (1963)).

16
17         Such evidence is material if there is a reasonable probability that, had the
           evidence been disclosed to the defense, the result of the proceeding would have
           been different although a showing of materiality does not require demonstration
18         by a preponderance that disclosure of the suppressed evidence would have
           resulted ultimately in the defendant's acquittal.  The reversal of a conviction is
19         required upon a showing that the favorable evidence could reasonably be taken to
           put the whole case in such a different light as to undermine confidence in the
20         verdict.

21 *Id.*, at 870 (*internal quotations and citations omitted*).  The obligation under *Brady* "is the

22 obligation of the government, not merely the obligation of the prosecutor." *United States v.*

23 *Blanco*, 392 F.3d 382, 393 (9th Cir. 2004).  Additionally, in the Ninth Circuit, a plaintiff

24

asserting a *Brady* claim pursuant to § 1983 against officers "must show that police officers acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors." *Tennison v. San Francisco*, 570 F.3d 1078, 1088 (9th Cir. 2009).

There are issues of fact as to whether Det. Slagle's failure to turn over information regarding the investigation of Ms. Morrison for embezzlement was a violation of Mr. Davis's and Mr. Northrop's due process rights. Information that Ms. Morrison was being investigated for embezzlement could, arguably, be used to impeach her, or to aid in discovering impeaching information. Washington Rule of Evidence 608. It was, therefore, evidence favorable to the defense. By 1990, at least, the Ninth Circuit had held "impeachment, as well as exculpatory, evidence falls within *Brady's* definition of evidence favorable to the accused." *United States v. Marashi,* 913 F.2d 724, 732 (9th Cir. 1990) (*internal quotation marks omitted*). There are issues of fact as to whether the government failed to produce the information. Although Clark County and Det. Slagle argue that Det. Slagle was unaware of this investigation, and that the investigation was turned over to the prosecutor's office by the investigating officers (thus, they argue, satisfying the Sheriff's Office's *Brady* obligation), for the purposes of this motion, there is no evidence in the record of either of these facts. The prosecutor and the criminal defense attorneys for both men testified that they were unaware of this investigation. Further, there are issues of fact as to whether Mr. Davis and Mr. Northrop were prejudiced. That is, whether there is a "reasonable probability" that the results would have been different. *Youngblood,* at 870. This is particularly true in light of the other uncontested *Brady* violations. For example, the failure to turn over the February 28, 1993 report regarding Monte Ollom as a possible suspect, and all the other evidence recently found in the archived box at the Sheriff's Office, including

1  the evidence of other suspects, the application for a protective order against Ms. Morrison's ex-

2  husband, etc.  In addition to those things, the allegedly undisclosed information that the victim

3  was being investigated for embezzlement "could reasonably be taken to put the whole case in

4  such a different light as to undermine confidence in the verdict."  *Youngblood,* at 870.

5      The Court notes that Clark County and Det. Slagle do not move for qualified immunity as

6  to this claim.  No further analysis under *Saucier* on this factual basis is necessary.  The motion

7  for summary judgment as to the failure to disclose the embezzlement investigation of Ms.

8  Morrison as one of the bases for Mr. Davis and Mr. Northrop's due process claims should be

9  denied.

10          b.  *Failure to Disclose the Exact Date of Ms. Morrison's Non-Identification of*
              *Mr. Northrop – Violation of Mr. Davis's Clearly Established Due Process*
11            *Rights?*

12      There are issues of fact as to whether Det. Slagle's failure to disclose the exact date of

13  Ms. Morrison's inability to pick Mr. Northrop out of the photo montage was a violation of Mr.

14  Davis's clearly established due process rights under *Brady*.  As stated above, Mr. Northrop is

15  collaterally estopped from making this claim.  This information could have been favorable to Mr.

16  Davis's defense and should have been produced.  Clark County and Det. Slagle argue that "it is

17  hard to reason" how the precise date of non-identification of Mr. Northrop is material to Mr.

18  Davis.  Dkt. 25, at 16.  However, Mr. Davis argues that there was no physical evidence linking

19  him to the crime, and that he was only targeted because he was an associate of Mr. Northrop.

20  Dkt. 50.  He argues that evidence tending to create doubt about Mr. Northrop being the dark

21  haired assailant also assists him.  *Id.*  There are also issues of fact as to whether the date of the

22  non-identification was turned over to Davis's defense team (Clark County points out that there

23  are dates on the back of the photos), and when the montage was turned over to the Prosecutor's

24

1    Office.  Dkt. 25.  There are issues of fact as to what day the montage viewing actually took place

2    (it is unclear from the record that Ms. Morrison actually viewed the montage on the day it was

3    put together; the pictures were dated January 14, 1993).  There are issues of fact as to whether

4    Det. Slagle "acted with deliberate indifference to or reckless disregard for an accused's rights or

5    for the truth."  *Tennison,* at 1088.  Lastly, there are issues of fact that the failure to disclose the

6    exact date prejudiced Mr. Davis, such that there is a "reasonable probability" that the results

7    would have been different.  *Youngblood,* at 870.

8           There are multiple issues of fact as to this *Brady* claim.  Whether it would be clear to a

9    reasonable officer in Det. Slagle's position that his conduct violated Mr. Davis's due process

10   rights in the situation he confronted cannot be decided on this record.  *Tennison,* at 1092.  There

11   are enough issues of fact as to this claim to require that the motion for summary judgment based

12   on qualified immunity (Dkt. 25) should be denied.

13           c.   *Failure to Disclose Information on Other Suspects - Violation of Mr. Davis*
                  *and Mr. Northrop's Clearly Established Due Process Rights*?

14

15           Clark County and Det. Slagle do not dispute that there was a failure to turn over the

16   documents found in Det. Slagle's archived files or the February 28, 1993 report by Officer

17   Anderson where Mr. Usery reported that he thought the man in the composite was Monte Ollom.

18   Defendants argue that Plaintiffs here cannot show that they were prejudiced by the failure,

19   because the evidence on other suspects may not be admissible because there was no link of those

20   suspects to the crime.  Dkt. 25.  They also raise the defense of qualified immunity in their reply.

     Dkt. 51.

21

22           Mr. Davis and Mr. Northrop properly point out that that the information does not have to

23   be admissible to be exculpatory and that defense counsel may use evidence of other possible

24   suspects for various reasons.  Dkt. 50.  As stated above, there are multiple issues of fact

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 38

1   regarding this evidence, including what Det. Slagle knew and what he did about what he knew.

2   It cannot be determined on this record that it would not be clear to a reasonable officer in Det.

3   Slagle's position that his conduct violated Mr. Davis's and Mr. Northrop's due process rights.

4   *Tennison,* at 1092.  The motion for qualified immunity should be denied.

5          3.   Due Process Claims against Clark County under § 1983

6        In order to set forth a claim against a municipality under 42 U.S.C. § 1983, a plaintiff must

7   show that the defendant's employees or agents acted through an official custom, pattern or policy

8   that permits deliberate indifference to, or violates, the plaintiff's civil rights; or that the entity

9   ratified the unlawful conduct.  *See Monell v. Department of Social Servs.*, 436 U.S. 658, 690-91

10  (1978); *Larez v. City of Los Angeles*, 946 F.2d 630, 646-47 (9th Cir. 1991)).  "Official municipal

11  policy includes the decisions of a government's lawmakers, the acts of its policymaking officials,

12  and practices so persistent and widespread as to practically have the force of law." *Connick v.*

13  *Thompson*, 131 S.Ct. 1350, 1359 (2011).  "Under §1983, local governments are responsible only

14  for their own illegal acts.  They are not vicariously liable under § 1983 for their employees'

15  actions." *Id.,* (*citing Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 692 (1978)).

16  "In limited circumstances, a local government's decision not to train certain employees about

17  their legal duty to avoid violating citizens' rights may rise to the level of an official government

18  policy for purposes of § 1983." *Connick*, at 1359.  "A municipality's failure to train its

19  employees in a relevant respect must amount to deliberate indifference to the rights of persons

20  with whom the untrained employees come into contact." *Id.,* at 1359-60.  "'[D]eliberate

21  indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a

22  known or obvious consequence of his action." *Id.,* at 1360.  "[W]hen city policymakers are on

23  actual or constructive notice that a particular omission in their training program causes city

24

1  employees to violate citizens' constitutional rights, the city may be deemed deliberately

2  indifferent if the policymakers choose to retain that program." *Id.*  A pattern of similar

3  constitutional violations by untrained employees is "ordinarily necessary" to demonstrate

4  deliberate indifference for purposes of failure to train. *Id.*  "Without notice that a course of

5  training is deficient in a particular respect, decision makers can hardly be said to have

6  deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

7        The *Connick C*ourt examined a failure to train claim based on the elected prosecutor's

8  alleged failure to train his assistant prosecutors regarding their disclosure requirements under

9  *Brady*. *Id.*  In concluding that § 1983 liability did not lie, the Court held that four prior occasions

10  that attorneys in his office committed *Brady* violations was insufficient to put him on notice that

11  his office's Brady training was inadequate. *Id.*

12        In his deposition for this case, Sergeant Craig Randall, a supervisor, testified that the six

13  detectives in Clark County worked closely together, and had a round table once a week to

14  discuss their cases. Dkt. 42-5, at 3.  As one of the detectives, Sgt. Randall recalls discussion of

15  the 1993 rape of Ms. Morrison.  Dkt. 42-5, at 3.  He testified that in 1993, in practice, they did

16  not turn over evidence to the defense or prosecution that an individual who was a victim of a

17  rape was being investigated for embezzlement, if the investigators "felt that [the victim] was

18  credible about the incident."  Dkt. 42-5, at 9.  Sgt. Randall testified that although it was not a

19  written policy, this was the "practice" in 1993, and it occurred in other cases as well.  *Id.*

20        Considering that this case involves police officers and not attorneys, there are issues of fact

21  as to whether Clark County's failure to train regarding their officers on obligations under *Brady*

22  at that time amounted to deliberate indifference to the constitutional rights of the individuals with

23  whom they would have contact.  Sgt. Randall's testimony, if viewed in a light most favorable to

24

1   Mr. Davis and Mr. Northrop, could be construed as "pattern" of *Brady* violations and

2   "demonstrate deliberate indifference for purposes of failure to train" under § 1983.

3        Even if Sgt. Randall's testimony is not sufficient to show a pattern, Plaintiffs point out that

4   under *Connick* there is an exception to the requirement of a pattern:  "single-incident" liability.

5   *Connick* does hold that where the "unconstitutional consequences of a failure to train" is "so

6   patently obvious that a city could be liable under § 1983 without proof of a preexisting pattern of

7   violations."  *Id.,* at 1361.  Although *Connick* found that "single incident" liability was not

8   appropriate there because the individuals to be trained regarding *Brady* were attorneys, who had

9   been to law school, taken the bar and were able to research *Brady* questions on their own, the

10  Court noted that the same may not be true of the police.  *Id.,* at 1361.

11       There are issues of fact here as to whether the failure to train Det. Slagle and other county

12  employees on their *Brady* obligations would result in unconstitutional consequences was "so

13  patently obvious" that Clark County should be "held liable under § 1983 without proof of a

14  preexisting pattern of violations."  *Id.,* at 1361.  Moreover, to the extent that Plaintiffs assert a

15  §1983 *Monell* claim against Clark County for the supervision and retention of Det. Slagle, that

16  claim is not addressed by this motion.  Defendants' motion to summarily dismiss the due process

17  claim against Clark County should be denied.

18       The above analysis is restricted to the federal claims and does not apply to the state law

19  claims against Clark County.

20  **C.  STATE LAW CLAIMS**

21       Clark County and Det. Slagle move for dismissal of Plaintiffs' state law claims, arguing that

22  they are barred by the statute of limitations, and that there is no recognized claim in Washington

23  for negligent investigation.  Dkt. 25.

24

1    1.  <u>Statute of Limitations</u>

2         Under RCW 4.16.080(2), Plaintiffs have three years to "commence" a personal injury

3    action such as this one.  In Washington, "[s]tatutes of limitations do not begin to run until a cause

4    of action accrues."  *1000 Virginia Ltd. Partnership v. Vertecs Corp.*, 158 Wash.2d 566, 575

5    (2006)(*citing* RCW 4.16.005).  "In many instances an action accrues immediately when the

6    wrongful act occurs."  *Id.*  Usually, a cause of action accrues when the party has the right to

7    apply to a court for relief."  *1000 Virginia Ltd. Partnership v. Vertecs Corp.*, 158 Wash.2d 566,

8    575 (2006)(*citing* RCW 4.16.005 and *Gazija v. Nicholas Jerns Co.*, 86 Wash.2d 215, 219

9    (1975)).  "In general terms, the right to apply to a court for relief requires each element of the

10   action be susceptible of proof."  *Haslund v. City of Seattle,* 86 Wn.2d 607, 619 (1976).  "The

11   infliction of actual and appreciable damage will trigger the running of the statute of limitations."

12   *Id.*

13        Plaintiffs were sentenced in 1993 and did not bring this case until August 25, 2012.  Dkt.

14   1.  The statute of limitations bars all claims based on events occurring before August 25, 2009.

15   The record contains various employment records of Det. Slagle.  Dkts. 43-4 -43-9.  All of these

16   records are dated before July of 2006 when Det. Slagle retired from the Clark County Sheriff's

17   Office.  *Id.*  To the extent that any of Plaintiffs' state law claims are based on events occurring

18   before August of 2009, including these records, they should be dismissed.

19        Plaintiffs argue that the statute of limitations did not begin to run until their convictions

20   were invalidated in 2010.  Dkt. 50.  They assert that post conviction relief (that is proving

21   themselves actually innocent) is a prerequisite to their negligence claim, so that element was not

22   "susceptible to proof" until 2010.  *Id.*

23

24

1     Plaintiffs' argument, is, however, contrary to Washington law.  In *Gausvik v. Abbey*, 126

2     Wash.App. 868 (2005), the Washington State Court of Appeals Division II, held that a father's

3     negligent investigation claim accrued for purposes of the statute of limitations when he was

4     convicted and sentenced for child rape, not when his conviction was invalidated.  The *Gausvik*

5     Court considered and rejected the argument urged by Plaintiffs here – that proximate cause and

6     injury could not be established under Washington law until invalidation of the conviction.  *Id*., at

7     881.  Unfair as this seems, it appears to be Washington law.  The unfairness has been somewhat

8     ameliorated with the adoption of Washington's Wrongful Conviction Compensation law, RCW

9     4.98.005, *et seq*., which became effective less than a month ago, on July 28, 2013.

10    Nor does RCW 4.16.190 bring Plaintiffs the relief that they seek.  Under RCW 4.16.190,

11    "[i]f a person entitled to bring an action mentioned in this chapter, except for a penalty or

12    forfeiture, . . . be at the time the cause of action accrued . . . imprisoned on a criminal charge

13    prior to sentencing, the time of such disability shall not be a part of the time limited for the

14    commencement of action."  Accordingly, under Washington law, the statute of limitations was

15    only tolled until they were sentenced in 1993.

16    Plaintiffs point out that there was some evidence that they did not know of, or have

17    reason to know of, and that was the contents of the archived box found in the Clark County

18    Sheriff's Office that was not turned over to the Clark County Prosecutors and was only produced

19    to the Plaintiffs on March 8, 2013.  Dkt. 50.  The contents of this box, found in the record at Dkt.

20    42-10, at 2-12, are hand written notes and other documents.  Further, Plaintiffs state that they

21    were unaware of the evidence of other suspect Monte Ollom until the report made about Mr.

22    Ollom was turned over sometime in 2010.  Dkts. 44, at 2 and 45, at 2.  "In many instances an

23    action accrues immediately when the wrongful act occurs, but in some circumstances where the

24

1    plaintiff is unaware of harm sustained a literal application of the statute of limitations could

2    result in grave injustice." *1000 Virginia Ltd. Partnership v. Vertecs Corp*., 158 Wash.2d 566,

3    575 (2006).  To avoid this, Washington uses a "discovery rule of accrual, under which the cause

4    of action accrues when the plaintiff discovers, or in the reasonable exercise of diligence should

5    discover, the elements of the cause of action." *Id.*, at 576.  "The action accrues when the

6    plaintiff discovers the salient facts underlying the elements of the cause of action."  *Id*."

7           To the extent that Plaintiffs' based their state law claims on evidence contained in Det.

8    Slagle's archived box or on the report about Monte Ollom, as another suspect, they are not

9    barred by the statute of limitations.  Unlike all the evidence in *Gausvik*, Plaintiffs were unaware

10   of when these "wrongful act[s] occurred." *1000 Virginia Ltd Partnership*, at 575.  That is, it was

11   not until they began this litigation that they discovered the Defendants' failure to turn over the

12   information contained in the archived box and in the report regarding Mr. Ollom.  Not only that,

13   but Plaintiffs had no reason to know of or attempt to discover the contents of the archived box or

14   the report.  They requested this type of information at their criminal trials and had no reason to

15   think these documents were in existence.  Accordingly, Plaintiffs' state law claims for intentional

16   infliction of emotional distress, negligence, and negligent training, supervision, and retention,

17   based on the evidence found in the archived box and the report regarding Monte Ollom, should

18   not be dismissed as barred by the statute of limitations.  To the extent that the state law claims

19   are based on other factual predicates, they should be dismissed.

20          2.  Negligent Investigation Against Det. Slagle

21          In their motion, Clark County and Det. Slagle argue that the claim for negligent

22   investigation against Det. Slagle should be dismissed.  Dkt. 25.

23

24

1    In Washington, a claim for negligence requires a showing of "(1) the existence of a duty

2    to the plaintiff, (2) a breach of that duty, (3) a resulting injury, and (4) the breach as the

3    proximate cause of the injury." *Lowman v. Wilbur*, 2013 WL 4018611 (2013) (*quoting Crowe v.*

4    *Gaston*, 134 Wash.2d 509, 514 (1998)).  Generally, a claim for negligent investigation does not

5    exist in Washington because there is no duty owed to a particular class of persons.  *M.W. v. Dep't*

6    *of Social & Health Serv*., 149 Wash.2d 589, 601 (2003); *Donohoe v. State*, 135 Wash.App. 824

7    (2006); *Rodriguez v. Perez*, 99 Wash.App. 439, 443 (2000).  An exception is recognized in

8    Washington for child abuse cases because of a duty found in a state statute.  *M.W.*, at 601.

9    To the extent that Plaintiffs' negligence claims against Det. Slagle are negligent

10   investigation claims, they should be dismissed.  They have failed to show that he owed them an

11   actionable duty.  They are not alleging a negligent child abuse investigation occurred, and so

12   cannot take advantage of the line of cases like *M.W.* or *Rodriguez*.

13   It appears that in connection with this claim, Plaintiffs discussed *Robb v. Seattle*, 176

14   Wn.2d 427, 433-34 (2013) at oral argument.  They urged that "the *Robb* decision says that

15   actions of commission, or actions of malfeasance as opposed to actions of nonfeasance are

16   actionable against police officers."

17   In *Robb*, the issue was "whether the police owe a duty to protect citizens from the

18   criminal acts of a third party where the police failed to pick up bullets from the ground near the

19   scene of a *Terry* stop and one of the people detained but not arrested returned to the scene,

20   picked up the bullets, and later shot a third party."  The Court examined Restatement (Second) of

21   Torts § 302B, which  provides:  "[a]n act or omission may be negligent if the actor realizes or

22   should realize that it involves an unreasonable risk of harm to another through the conduct of the

23   other or third person which is intended to cause harm, even though such conduct is criminal."

24

1    The *Robb* Court held that Restatement (Second ) of Torts § 302B "may create an independent

2    duty to protect against the criminal acts of a third party where the actor's own affirmative act

3    creates or exposes another to the recognizable high degree of risk of harm." *Id*., at 429-430.  The

4    Court found that such a "duty arises outside the context of a special relationship only where the

5    actor's conduct constitutes misfeasance.  Mere nonfeasance is insufficient to impose a duty on

6    law enforcement to protect others from the criminal actions of third parties." *Id.,* at 439.  It

7    found that in that case, that the officers taking control during a *Terry* stop did not constitute "an

8    affirmative act for purposes of imposing a duty under Restatement § 302B." *Id.*  The Court

9    further noted that, "[t]here was no affirmative act in this case, only an omission, because law

10   enforcement did not create a new risk of harm but instead failed to eliminate a risk when they

11   failed to pick up bullets left at the scene by another." *Id.*

12        To the extent that they intended this argument to apply to a claim of negligent

13   investigation against Det. Slagle, Plaintiffs make no reasonable showing that Det. Slagle owed

14   them a duty under § 302 of the Restatement (Second) of Torts, *i.e.* that he is in some manner

15   responsible for a third party's criminal conduct toward them.  They fail to show that *Robb* stands

16   for the proposition they urge.  *Robb* does not discuss or in any manner rule on the tort of

17   negligent investigation.  Defendants' motion (Dkt. 25) should be granted and the negligent

18   investigation claim asserted against Det. Slagle should be dismissed.

19        3.  Negligent Training, Supervision, and Retention Claim Against Clark County

20        Defendants further argue that the claim against Clark County for negligent training,

21   supervision, and retention is derivative of the negligent investigation claim against Det. Slagle,

22   and if that claim fails, so does the claim against Clark County.  Dkt. 25.

23

24

ORDER ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT- 46

1    In response, Plaintiffs argue that their claim against Clark County is not a derivative

2    claim because as an employer, Clark County owed Mr. Davis and Mr. Northrop a duty to

3    properly train, supervise, and retain employees "where an employer knows or should know that

4    the employee represents a foreseeable risk of harm to third parties."  Dkt. 50, at 18 (*citing*

5    *LaPlant v. Snohomish County,* 162 Wn.App. 476, 478 (2011).  Plaintiffs argue that Clark County

6    owed them a duty under the Restatement (Second) of Torts § 302(B) & 321 "because Det.

7    Slagle's affirmative acts created a recognizable high degree of risk of harm."  *Id.* (*citing Robb v.*

8    *Seattle,* 176 Wn.2d 427, 433-34 (2013)).

9            a.   *County Liability based on Vicarious Liability for Det. Slagle's Investigation*

10   Defendants' motion to dismiss Mr. Davis and Mr. Northrop's negligence claims against

11   Clark County, based on Det. Slagle's negligent investigation, should be granted.  Under

12   Washington law,

13           An employer is vicariously liable for the negligent acts of its employees
             conducted within the scope or course of employment.  Even when an employee
14           acts outside the scope of employment, however, an employer has a limited duty to
             control an employee for the protection of a third person.  This direct, independent
15           duty can give rise to an action for negligent hiring, training, and supervision.  In
             Washington, a cause of action for negligent supervision requires a plaintiff to
16           show that an employee acted outside the scope of his or her employment.  But
             when an employee commits negligence within the scope of employment, a
17           different theory of liability—vicarious liability— applies.  Under Washington
             law, therefore, a claim for negligent hiring, training, and supervision is generally
18           improper when the employer concedes the employee's actions occurred within the
             course and scope of employment.
19
20   *LaPlant v. Snohomish County,* 162 Wn.App. 476, 478 (2011).  Clark County does not assert that

21   Det. Slagle was acting outside the scope of his employment.  Accordingly, to the extent that the

22   Plaintiffs' claims are based on their assertion that Det. Slagle's investigation was negligent and

23   that the County is vicariously liable for Det. Slagle's negligent investigation, the claim should be

24   dismissed because there is no recognized tort for the claim of negligent investigation and so no

vicarious liability for Clark County.  *See LaPlant*, at 478.  It is unclear the extent to which Plaintiffs make a claim for vicarious liability against Clark County based on other alleged acts of negligence by other county employees.  In any event, there is no motion on such a claim.

   b.  *County Liability Based on Independent Duty to Train and Supervise – for Actions Outside the Scope of Employment*

Plaintiffs argue that they make claims against Clark County based on its independent duty to properly train, supervise, and retain its employees.  Dkt. 50.  Washington employers do have a limited duty to control an employee for the protection of third parties.  *Niece v. Elmview Group Home*, 131 Wash.2d 39, 48 (1997) (holding 'where an employee is acting outside the scope of employment, the relationship between employer and employee gives rise to a limited duty, owed by an employer to foreseeable victims, to prevent the tasks, premises, or instrumentalities entrusted to an employee from endangering others").  "This direct, independent duty can give rise to an action for negligent hiring, training, and supervision."  *LaPlant*, at 478.

In order to make a claim against Clark County based on its independent duty to properly train, supervise, and retain its employees under Washington law, Plaintiffs must point to evidence that Det. Slagle (or other county employees) were acting outside the scope of their employment.  *Niece v. Elmview Group Home*, 131 Wash.2d 39, 48 (1997).  Plaintiffs fail to point to facts from which a jury could conclude that Det. Slagle did so, that he "step[ed] aside from [Clark County's] purposes in order to pursue a personal objective."  *Id.*  The motion to summarily dismiss the claim should be granted because Plaintiffs have not carried their burden.

**D.  CONCLUSION**

Defendants' motion to summarily dismiss Plaintiffs' due process claims that the procedures used to identify them were impermissibly suggestive should be granted.  These claims are barred by the doctrine of collateral estoppel.  Mr. Northrop's *Brady* based due process claim related to

1   the date Ms. Morrison failed to identify him in the photo montage is also barred by collateral

2   estoppel and should be dismissed.  To the extent that Plaintiffs' state law claims of intentional

3   infliction of emotional distress, negligence, and negligent training, supervision, and retention are

4   based on facts other than the those contained in the recently discovered archived box and

5   February 28, 1993 report regarding other possible suspect Monte Ollom, they are barred by the

6   statute of limitations and should be dismissed.  Plaintiffs' state law claims for negligent

7   investigation asserted against Det. Slagle should be dismissed.  To the extent that Plaintiffs'

8   negligent training, supervision, and retention claim against Clark County is based on Det.

9   Slagle's alleged negligent investigation it should be dismissed.  To the extent that Plaintiffs'

10  negligent training, supervision, and retention claim against Clark County is based on its

11  independent duty to properly train, supervise, and retain its employees, the claim should be

12  dismissed because the Plaintiffs failed to point to evidence that a county employee acted outside

13  the scope of their employment.

14      It is not clear to the Court exactly which claims remain.  Plaintiffs should, in the pretrial

15  order, identify the claims remaining for each Plaintiff against each Defendant.  In Plaintiffs' trial

16  brief, they should set forth the elements of each claim, and a brief summary of the evidence to be

17  offered in support of each element.

18                              **III.    <u>ORDER</u>**

19  Accordingly, it is **ORDERED** that:

20  Defendants' Motion for Summary Judgment (Dkt. 25) **IS**

21      • **GRANTED, IN PART, AS FOLLOWS:**

22

23

24

1        o   Plaintiffs' due process claims that the procedures used to identify them were

2            impermissibly suggestive are barred by collateral estoppel and **ARE**

3            **DISMISSED**;

4        o   Mr. Northrop's *Brady* based due process claim related to the date Ms.

5            Morrison failed to identify him in the photo montage is barred by collateral

6            estoppel and **IS DISMISSED**;

7        o   Plaintiffs' state law claims based on evidence other than that contained in the

8            recently discovered archived box and February 28, 1993 report regarding

9            other possible suspect Monte Ollom are barred by the statute of limitations

10           and **ARE DISMISSED**;

11       o   Plaintiffs' state law claims for negligent investigation asserted against Det.

12           Slagle **IS DISMISSED**; and

13       o   Plaintiffs' negligent training, supervision, and retention claim (based on Det.

14           Slagle's alleged negligent investigation) **IS DISMISSED**;

15       o   To the extent that Plaintiffs' negligent training, supervision, and retention

16           claim against Clark County is based on its independent duty to properly train,

17           supervise, and retain its employees, the claim **IS DISMISSED**; and

18   •   **DENIED IN ALL OTHER RESPECTS.**

19       The Clerk is directed to send uncertified copies of this Order to all counsel of record and

20   to any party appearing *pro se* at said party's last known address.

21       Dated this 20th day of August, 2013.

22

23

ROBERT J. BRYAN
United States District Judge

24